Mona Amini, Esq.
Nevada Bar No. 15381
**KAZEROUNI LAW GROUP, APC**
6940 S. Cimarron Road, Suite 210
Las Vegas, NV 89113
Tel: 800-400-6808
E: mona@kazlg.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

*Attorneys for Plaintiff M.C.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **M.C.**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**AMERICAN ADDICTION CENTERS, INC.**,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff M.C. ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant American Addiction Centers, Inc., ("AAC" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

1

## I.    <u>INTRODUCTION</u>

1.    A person's struggle with alcohol or drug addiction is often among the most sensitive, and closely guarded facets of their life.

2.    The unwanted disclosure of such information can be enormously harmful.[1] It can impact an individual's reputation, livelihood, and personal relationships. And, if people struggling with addiction are unable to trust that the organizations purporting to offer treatment will protect their sensitive, private information, they are much less likely to seek help when they need it most.[2]

3.    Unfortunately, unbeknownst to Plaintiff and other visitors to Defendant's website, Defendant does not keep sensitive information about its visitors private. Instead, Defendant records the fact that its website visitors, like Plaintiff and Class Members, are seeking medical treatment for addiction, the specific centers they seek treatment at, and their attempts to verify whether treatment is covered by their health insurance (collectively, "Sensitive Health Information"), and transmits that information to third parties, including Alphabet, Inc. ("Google"), through its use of surreptitious online tracking tools.

4.    Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprises. Thus, any information about a person captured by these online behemoths can be used to barrage that person with ads. If Google receives information that a person suffers from an addiction, it will use that information, and allow its clients to use that information, to stream ads to that person's computers and smartphones for products and services related to their addiction.

5.    Google offers website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including *Google Analytics*, *Google AdSense*, and *Google Tag Manager* products (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for

---

[1]    *Stigma and Discrimination*, NATIONAL INSTITUTE ON DRUG ABUSE, https://nida.nih.gov/research-topics/stigma-discrimination#references (last visited June 16, 2026).
[2] *Id.*

CLASS ACTION COMPLAINT

purposes including deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

6. Google's massive database of consumer information only exists, and can only exist, because users of the Business Tools, like Defendant, provide their users' data to Google. To use the Business Tools, a website operator must install Google's internet surveillance software onto their website, including tracking pixels ("Pixels") and cookies (collectively, the "Tracking Tools").

7. Moreover, if a website operator wishes to track specific information using the Business Tools, such as submissions of an online form, the website operator must configure the Tracking Tools to track form submissions.

8. In essence, when website operators use Google's Business Tools, they choose to participate in its mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their customers' privacy.

9. AAC is one of the many companies that has chosen to prioritize its marketing efforts over its customers' privacy by installing Google's Tracking Tools on its website.

10. AAC is a leading provider for addiction treatment nationwide, offering residential, outpatient, and aftercare programs in California, Florida, Texas, Nevada, Massachusetts, Mississippi, New Jersey, and Rhode Island.[3]

11. AAC's website – https://americanaddictioncenters.org/ (the "Website") – allows prospective patients to research treatment programs, complete admissions intake forms, initiate a call with Defendant's admissions employees directly, and complete an online assessment to verify whether their medical insurance provider covers treatment at AAC ("Insurance Verification").

12. Defendant assures Website users of the "confidential, free, and no obligation ways" that they can contact AAC to learn about treatment.[4] Defendant's Insurance Verification and admissions intake forms further promise prospective patients that their "information is secure &

---

[3] *About Us*, AMERICAN ADDICTION CENTERS, https://americanaddictioncenters.org/about-us (last visited June 16, 2026).

[4] *Contact Us*, AMERICAN ADDICTION CENTERS, https://americanaddictioncenters.org/contact-us (last visited June 16, 2026).

CLASS ACTION COMPLAINT

protected by HIPAA"[5] and that "Everything is 100% confidential."[6] Elsewhere on the Website, Defendant touts its vision to "foster a world free from the stigma of addiction" and states that "No funding is generated from any advertising or external sources."[7]

13.    Among AAC's rehabilitation guides and resources, it provides the following:

**Is Rehab Confidential?**
People who are being treated for a substance use disorder (SUD) have additional protections in place with the Code of Federal Regulations (CFR) Title 42 Part 2. This regulation protects "the records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education prevention, training, treatment, rehabilitation, or research…" Basically, these confidentiality protections help address concerns that discrimination and fear of prosecution deter people from entering treatment for a SUD.

[. . .]
The confidentiality of patient records maintained by us is protected by federal law and regulations. Generally, we may not say to a person outside the treatment center that you are a patient of the treatment center or disclose any information identifying you, your diagnosis, your prognosis, or your treatment unless:
1.  You consent in writing;
2.  The disclosure is allowed by a court order; or
3.  The disclosure is made to medical personnel in a medical emergency or to qualified personnel for research, audit, or program evaluation.[8]

14.    Nonetheless, when Plaintiff and Class Members visited the Website, their personal Sensitive Health Information was tracked by Defendant using the Tracking Tools and shared with Google. Defendant *never* obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties.

15.    At all relevant times to their action, Plaintiff and Class Members gave no informed consent for their Sensitive Health Information to be transmitted to third parties, including to Google, one of the largest advertisers and compilers of user information.

---

[5]    *Verify Your Rehab Coverage Instantly*, AMERICAN ADDICTION CENTERS, https://americanaddictioncenters.org/verify-insurance (last visited June 16, 2026).
[6]    *Drug & Alcohol Rehab Application Form*, AMERICAN ADDICTION CENTERS, https://americanaddictioncenters.org/rehab-application-form (last visited June 16, 2026).
[7] *About Us*, AMERICAN ADDICTION CENTERS, https://americanaddictioncenters.org/about-us (last visited June 16, 2026).
[8] *Rehab & Drug Abuse Confidentiality (HIPAA & Privacy of Records)*, AMERICAN ADDICTION CENTERS, https://americanaddictioncenters.org/rehab-guide/confidentiality-hipaa (last visited June 16, 2026).

CLASS ACTION COMPLAINT

16. Health information is regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[9]

17. Accordingly, Defendant's disclosure of Plaintiff's and Class Members' Sensitive Information constitutes a violation of HIPAA.

18. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with online service providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties; (iv) loss of benefit of the bargain; (v) diminution of value of their Sensitive Health Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Sensitive Health Information.

19. Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Defendant: Invasion of Privacy; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*; violations of the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 638.50 & 638.51; and Invasion of Privacy under the California Constitution.

## II.  PARTIES

*Plaintiff M.C.*

20. Plaintiff M.C. is a citizen of the State of California, residing in San Bernardino County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

---

[9] 18 U.S.C. § 1320d-(6).

CLASS ACTION COMPLAINT

21. In 2025 and 2026, Plaintiff utilized the Website on her personal electronic device to research AAC's addiction treatment programs and inquire about inpatient treatment for herself.

22. Plaintiff completed and submitted a contact form and the Insurance Verification on the Website, following which she was contacted by Defendant's representative via phone call and text message.

23. Defendant's representative repeatedly encouraged Plaintiff to visit the Website and complete the Insurance Verification, including by sending her links to the Insurance Verification.

24. Unbeknownst to Plaintiff, the Website transmitted the Sensitive Health Information that she communicated to Defendant using the Website, including the fact that she was interested in addiction treatment and that she had filled out a form to assess her insurance coverage, to third parties including Google.

25. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which Defendant allowed and enabled third parties including Google to intercept, was: 1) that Plaintiff struggles with addiction; 2) that Plaintiff was seeking treatment for her addiction; and 3) that Plaintiff initiated, filled out, and submitted a request for Defendant to assess whether her insurance provider would cover treatment.

26. Plaintiff never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided to Defendant.

27. On every occasion that she visited the Website, Plaintiff possessed an account with Google, and she accessed the Website while logged into her Google account on the same device.

28. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff was immediately flooded with targeted online advertisements for addiction treatment and recovery centers.

29. Plaintiff makes an effort to protect her privacy on the internet to the extent possible by, for example, declining optional cookies.

6

CLASS ACTION COMPLAINT

30. Plaintiff believes that the disclosure and use of her private Sensitive Health Information for targeted advertising purposes is an invasion of her privacy, especially in light of the sensitive nature of information related to addiction treatment.

***Defendant American Addiction Centers, Inc.***

31. Defendant American Addiction Centers, Inc. is a Nevada corporation with its principal place of business at 500 Wilson Pike Cir Ste 360, Brentwood, TN 37027.

### III.   JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendant.

33. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

34. This Court has personal jurisdiction over Defendant because Defendant is incorporated in the State of Nevada, and Defendant has otherwise made or established contacts in the State of Nevada and in this judicial district sufficient to permit the exercise of personal jurisdiction.

35. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Defendant resides in this judicial district, and/or because a substantial part of the events giving rise to the claim occurred in this judicial district.

### IV.   FACTUAL ALLEGATIONS

**A.   THE AAC WEBSITE**

36. Founded in 2007, AAC operates the largest network of rehabilitation facilities nationwide. It offers inpatient, partial-hospitalization, outpatient, and aftercare programs,

CLASS ACTION COMPLAINT

specializing in the simultaneous treatment of substance use disorder and co-occurring mental health issues.

37. AAC wholly owns and operates the Website, available at https://americanaddictioncenters.org/.

38. Unbeknownst to prospective, current, and past patients, AAC secretly embeds a host of tracking technologies on the Website, facilitating the interception and disclosure of private and sensitive health records of users visiting the Website.

39. As described in the sections below, AAC's Website uses Tracking Tools provided by Google. Plaintiff and Class Members had no way of knowing AAC used these Tracking Tools or that their private data would be used and intercepted as a result.

**B.      BACKGROUND ON TRACKING TECHNOLOGY**

40. Pixels are one of the more common forms of tracking technology used by website operators to track users' behavior, interactions, and the content of their communications online.

41. Pixels are typically snippets of code embedded on a website that surreptitiously intercept a user's actions, including private communications on that app or property.

42. Pixels can collect a shocking amount of private information regarding an individual's online communications, including their searches, queries, what content they select and view, what they enter into online forms, and their habits and behaviors.

43. Web developers, like AAC, can use pixels to send additional information specific to their websites. As described herein, AAC configured the pixels at issue in this case to transmit and intercept Website users' private health records, including the health conditions they sought to treat, the treatment options they were considering, and whether they contacted AAC or submitted information to allow AAC to assess whether prospective patients could become AAC patients.

44. As the Federal Trade Commission ("FTC") explains, one of the purposes of using pixels is to monetize consumers' data:[10]

---

[10] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Mar. 3, 2026).

CLASS ACTION COMPLAINT

> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns . . . Another is that companies can monetize the data collected[.]

45. Particularly problematic, consumers have no way of knowing these pixels are present because they are invisible. The FTC further warns that: [11]

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with . . . Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.

## C.   GOOGLE'S TRACKING TOOLS

46. Google is one of the largest digital advertiser platforms in the country, with a market capitalization of over $3 trillion dollars. Google accounts for 26.8% of the total digital advertising revenue generated in the United States.[12] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[13]

47. Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." [14]

48. Google offers various tracking technologies, including Google Analytics and Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing

[11] *Id.*

[12] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 23, 2025).

[13] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20ther%20past%20year (last accessed Oct. 23, 2025).

[14] ALPHABET INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

9

CLASS ACTION COMPLAINT

Google's overall ad revenue. Products like Google Analytics, Google Chrome, and Google's Android operating system also improve the company's advertising network and capabilities by providing direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

49. Google advertises Google Analytics and other business tools to website operators to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[15]

50. Google Analytics is deployed by dropping a piece of Google-engineered code on a given web property or app. This code contemporaneously intercepts a user's interaction with the web property or app every time the user visits or uses it, including what pages they visit, what they click on, and input into text fields.

51. The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. this includes multiple cookie values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their home), and more. this does not require a person to have a Google account, to be signed into their Google account, or using a Google product. Google has a special set of cookies and systems created specifically to track and identify individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.[16]

52. Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with

---

[15] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Oct. 23, 2025).
[16] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

CLASS ACTION COMPLAINT

interests they express through their online browsing and purchase activities). However, the main purpose of Google's tracking technologies, including Google Analytics, is to promote targeted ads both on Google.com (so called "search ads" or "Google ads") or other Google owned and operated products (e.g., YouTube), and across Google's display network (Google "display ads") which include thousands if not millions of web properties.

53.    In addition to providing customers with analytics ads services, Google also uses the data collected through Google Analytics and other tracking technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users. Thus, the data AAC disclosed, and allowed Google to intercept, is actively used by Google to improve and serve advertisements. And individual consumers who have their data disclosed by one entity (for instance, AAC) will see ads for other entities based on their data as a result of Google's advertising system.

54.    Further, customers like AAC can also send data to Google through a server-to-server connection or through a third-party intermediary. This allows customers like AAC to disguise what data it sends to Google because no one (other than these parties) can observe what data is sent server-side.

### i.    The Data AAC Disclosed Uniquely Identified Each Specific Class Member, Including Plaintiff

55.    Google provides customers like AAC with one or more unique identifiers precisely so each individual whose data is sent through the Tracking Tools can be identified and targeted.

56.    Customers like AAC can send data to Google alongside Google-specific cookies linked to a unique identifier, including "ide" DoubleClick cookie, "cid" identifier, and "sid" identifier. These cookies serve to uniquely track and identify individual consumers.

57.    In this way, these unique identifiers serve a similar function to social security numbers used by the United States Government—they are associated with only one person. Much like the Government knows which specific person is associated with each social security number, through these identifiers, Google knows which specific person is associated with each of its unique identifiers.

CLASS ACTION COMPLAINT

58.     But this is not all Defendant disclosed. Google also obtained Plaintiff's and Class Members' IP addresses, which are also used to identify individual consumers. For instance, Google uses consumers' IP addresses, either alone or in combination with other information, to match and identify each individual whose data it receives through its Tracking Tools.

59.     This is especially true for individuals who have accounts with Google. One-third of Americans have accounts with Google's Gmail e-mail client and over 80-percent of Americans use YouTube, Google's video client.[17] When these users visit a website, like the Website, that utilizes Google's Tracking Tools, any information collected by the Pixels can be linked to the user's Google accounts.

### ii.     AAC's Unauthorized Disclosure of Plaintiff's and Class Members' Sensitive Health Information to Google

60.     Plaintiff and Class Members used the Website to research health conditions and access services related to addiction treatment. While visiting the Website, Plaintiff and Class Members each called Defendant's admissions employees and/or completed Defendant's Insurance Verification.

61.     Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant through the Website to third parties, including Google.

62.     The following screenshots ("Figures 1-9") depict examples of the network transmissions made by the Google Tracking Tools installed on the Website.

63.     As Figures 1-4 show, when a prospective patient submits a form or initiates a direct call to Defendant's employees through the Website, the information simultaneously transmitted to Google includes the treatment center and location they are seeking admission to (in this example, the Laguna Treatment Center in Aliso Viejo, California), their specific medical condition (drug and

---

[17] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Oct. 23, 2025); Jeffrey Gottfried and Eugene Park, *Americans' Social Media Use 2025*, PEW RESEARCH (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/ (last visited Mar. 4, 2026).

CLASS ACTION COMPLAINT

alcohol addiction), the purpose of their call or form submission (admissions or referrals), and the action they took to further their intended course of treatment ("click" or "telephone_click"). Further, as Figures 5-9 show, when a prospective patient researches medical insurance coverage, initiates a call to Defendant's employees, or completes the Insurance Verification on the Website, the information simultaneously transmitted to Google includes their medical insurance provider (in this example, Aetna), the specific treatment they are seeking coverage for (Suboxone, a prescription medication used to treat opioid dependence), the treatment center and location they are seeking admission to (Recovery First Treatment Center in Hollywood, Florida), and the action they took to verify their medical insurance coverage for addiction treatment ("user_engagement," "telephone_click" or "form_submit").

| | |
|---|---|
| sid | 1769626461 |
| sct | 1 |
| seg | 1 |
| dl | https://americanaddictioncenters.org/contact-us |
| dr | https://americanaddictioncenters.org/treatment-centers/laguna-treatment-center |
| dt | American Addiction Centers Contact Us |
| en | click |
| ep.link_id | |
| ep.link_classes | jsx-3993667340 |
| ep.link_url | https://maps.app.goo.gl/zmo5xtGdfVbD6MDUA |
| ep.link_domain | maps.app.goo.gl |
| ep.outbound | true |
| _et | 1586 |
| tfd | 886431 |

| | |
|---|---|
| dp | /treatment-centers/laguna-treatment-center |
| sid | 1769626461 |
| sct | 1 |
| seg | 1 |
| dl | https://americanaddictioncenters.org/treatment-centers/laguna-treatment-center |
| dr | https://americanaddictioncenters.org/treatment-centers |
| dt | Laguna Treatment Center: Drug & Alcohol Rehab in Aliso Viejo, CA |
| en | leads_combined |
| _c | 1 |
| _et | 1 |
| tfd | 732352 |

*Fig. 1 & 2.* *Screenshots depicting network transmissions to Google when a user submits a form on the Website requesting to be contacted with information regarding admission to Defendant's Laguna Treatment Center.*

13

CLASS ACTION COMPLAINT

**Fig. 3 & 4.** *Screenshots depicting network transmissions to Google when a user initiates a direct call to Defendant's admissions employees on the Website.*

14

CLASS ACTION COMPLAINT

**_Fig. 5-9._** _Screenshots depicting network transmissions to Google when a user browses webpages, initiates a call to Defendant's employees, and/or submits a form relating to insurance coverage on the Website._

64.     Further, each of these transmissions is accompanied by Google's "tid," "cid," and/or "sid" unique identifiers. Accordingly, Google does not merely learn that an anonymous Website user is considering addiction treatment, it learns that a specific, individually identified user is seeking drug and alcohol addiction treatment at a specific location.

65.     In their default state, the Tracking Tools record and transmit only "automatic events," consisting largely of routine user behavior, such as the URLs visited by internet users.[18] Defendant purposely configured the Tracking Tools on the Website to collect and transmit additional user data,

---

[18]     _Automatically Collected Events_, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069 (last visited Mar. 3, 2026).

CLASS ACTION COMPLAINT

including the specific buttons users press and actions they take on the Website, beyond the Tracking Tools' default state.

**D.    AAC DID NOT HAVE PLAINTIFF'S OR CLASS MEMBERS' CONSENT TO SHARE THEIR SENSITIVE HEALTH INFORMATION.**

  **i.    Defendant Failed to Inform Plaintiff and Class Members of its Disclosure of their Sensitive Health Information.**

66.    Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google.

67.    Specifically, Plaintiff and Class Members had a reasonable expectation of privacy, based on the highly sensitive nature of addiction treatment and Defendant's own representations regarding the confidentiality of such information, that their Sensitive Health Information would be kept private and not be used for targeted advertising purposes. Defendant did not inform Plaintiff that it was sharing her Sensitive Health Information with third parties, including Google.

68.    Despite never obtaining consent from Website users like Plaintiff and Class Members, Defendant allowed third parties such as Google to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

69.    By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

  **ii.    The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members.**

70.    The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users such as Plaintiff and Class Members were unable to detect the Tracking Tools on the Website.

71.    Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

CLASS ACTION COMPLAINT

72. Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to unauthorized third parties for advertising purposes without their express consent. Instead, as discussed above, AAC's Website repeatedly reassures users that their privacy will be respected.

73. Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Defendant's conduct.

**E.    DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION.**

**i.    Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Health Information.**

74. As explained, *supra*, users of Google' Business Tools, like Defendant, receive access to enhanced advertising and marketing analytics services in exchange for installing the Tracking Tools on their website.

75. Upon information and good faith belief, Defendant, as a user of Google' Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Sensitive Health Information.

**ii.    Plaintiff's and Class Members' Data Had Financial Value.**

76. Plaintiff's and Class Members' Sensitive Health Information has value, and Defendant's interception and disclosure of that Sensitive Health Information harmed Plaintiff and the Class.

77. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[19]

---

[19] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 3, 2026).

CLASS ACTION COMPLAINT

78. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

79. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

80. This information is most valuable when access to it is limited. Accordingly, the unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm to Plaintiff and Class Members.

**F.      DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.**

81. The disclosure of Plaintiff's and Class Members' Sensitive Health Information via the Tracking Tools contravenes the letter and spirit of HIPAA's *Standards for Privacy of Individually Identifiable Health Information* (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[20]

82. The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") and Personal Health Information ("PHI") that is held or transmitted by a covered entity such as Defendant.

83. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

---

[20] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Mar. 24, 2025).

18

CLASS ACTION COMPLAINT

84. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

85. There are 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.

86. Additionally, information revealing that an individual is receiving medical service or treatment is PHI. In its 2012 *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, the U.S. Department of Health and Human Services (the "HHS") instructed health care providers that, while identifying information alone is not necessarily PHI if it is part of a public source uncoupled from health data (e.g., a phone book), "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."

87. HHS has repeatedly instructed covered entities that patient status is protected by the HIPAA Privacy Rule:

    i. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

    ii. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

    iii. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

88. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, i.e., to perform analysis on data key to their operations.

CLASS ACTION COMPLAINT

89.    When the information that a regulated entity collects through technologies or discloses to third parties (e.g., tracking technology vendors like Google) includes PHI, the protections under the HIPAA Privacy Rule apply.[21]

90.    Put simply, HIPAA covered entities such as Defendant are not permitted to use tracking technology tools (like Pixels) in a way that exposes an individual's PHI to any third party without that individual's express and informed consent.

91.    In a joint letter to approximately 130 hospital systems and telehealth provides, the Office for Civil Rights (the "OCR") at the HHS and the FTC acknowledged that tracking technology tools "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[22] Disclosures to third parties by these tracking tools can "reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[23]

92.    The HHS and FTC warn that the "[i]mpermissible disclosures of an individual's [PHI] to third parties may result in a wide range of harms to an individual or others," including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[24]

93.    Under Federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[25]

94.    Consistent with this restriction, the HHS has issued marketing guidance that provides:

> With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of her or her protected health information can be made for marketing . . . . Simply put, a covered entity

---

[21] *See Letter regarding Use of Online Tracking Technologies*, FEDERAL TRADE COMMISSION, available at: https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited Mar. 24, 2026).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

CLASS ACTION COMPLAINT

may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[26]

95. The HIPAA Privacy Rule further requires any "covered entity"—which includes Defendant—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

96. In contravention of HIPAA, Defendant failed to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[,]" 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

97. Defendant failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f. Failing to effectively train their workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation pherhing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in

---

[26] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 24, 2026).

CLASS ACTION COMPLAINT

violation of 45 C.F.R. § 164.530(c).

98.    Defendant violated the Privacy Rule by providing patient information to third parties without first obtaining express consent from Plaintiff and Class Members.

**G.    PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY.**

**i.    Reasonable Expectation of Privacy on the Internet**

99.    Most websites, including Defendant's Website, use HyperText Transfer Protocol Secure ("HTTPS"), a protocol for transmitting information over the internet.

100.    When using HTTPS, nearly all communication between a website user and the website is encrypted.[27] The only information transmitted unencrypted is the identity of the web "host." For example, if searching Google for https, one may visit the following URL: https://www.google.com/search?q=https. The "host" in this URL is www.google.com. This information must be transmitted unencrypted, because it is routing information required to identify the destination for the request. The remainder of the information, including the "search?q=https" portion of the URL, is transmitted encrypted.

101.    Because nearly all information between a browser and a website is encrypted, an observer of those communications (such as an individual's internet service provider) could learn that the user of the browser is communicating with a specific website, and certain record information, such as how often those communications occur. However, an observer cannot learn the substance of the communications, including which specific web pages the user visited.

102.    Due to encryption, even a technically sophisticated internet user can expect a significant degree of privacy in their communications sent over HTTPS: users can reasonably expect that the contents of their communications, including the web pages they visit and any inquiries they make or actions they take on those web pages, will only be available to the user themselves and the website operator.

103.    Defendant's use of the Tracking Tools violates these reasonable expectations.

---

[27] Tanish Dewase, *Why Do We See Query Parameters in HTTPS URLs? Is It Still Secure?*, MEDIUM, (July 30, 2025) https://medium.com/h7w/why-do-we-see-query-parameters-in-https-urls-is-it-still-secure-5f3b6ee7702a

CLASS ACTION COMPLAINT

### ii.    Reasonable Expectation of Privacy for Medical Information

104.    At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share their Sensitive Health Information with third parties for a commercial purpose unrelated to providing them with medical care.

105.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

106.    For example, a Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[28]

107.    Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[29]

108.    And, in a study performed by the National Institute of Health, nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[30]

109.    Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

---

[28] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 3, 2026).
[29] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.
[30] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

CLASS ACTION COMPLAINT

## V.    TOLLING AND ESTOPPEL

110.    Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the Tracking Tools on the Website.

111.    The Tracking Tools on the Website were and are invisible to the average website visitor.

112.    Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

113.    Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

114.    Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to users, including Plaintiff and Class Members, that by initiating a call or submitting a form on the Website, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

115.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

116.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

117.    The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI.    CLASS ALLEGATIONS

118.    This action is brought by the named Plaintiff on her behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

CLASS ACTION COMPLAINT

119. Specifically, the Nationwide Class that Plaintiff seeks to represent is defined, as follows:

> **Nationwide Class:** All natural persons who used the Website and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party via the Tracking Tools.

120. Plaintiff also asserts claims on behalf of, at least, the following state subclass:

> **California Subclass:** All natural persons in California who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party via the Tracking Tools.

121. Excluded from the proposed Classes are any claims for personal injury, wrongful death, or other property damage sustained by the Classes; Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

122. Plaintiff reserves the right to amend the definitions of the Classes or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

123. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 1,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

124. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

    a. Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

    b. Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

    c. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

25

CLASS ACTION COMPLAINT

    d. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

    e. Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of users' Sensitive Health Information;

    f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

    g. Whether Defendant violated the statutes asserted as claims in this Complaint;

    h. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

    i. Whether Defendant knowingly made material omissions with respect to its data security and/or privacy practices; and

    j. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

125. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

126. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

127. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

128. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is

CLASS ACTION COMPLAINT

superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

129.    Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

130.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

    b.    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

    c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

    d.    Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

    e.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

    f.    Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

131.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names of the Class Members—each of whom initiated a call to Defendant's admissions

CLASS ACTION COMPLAINT

employees from the Website and/or completed a form on Defendant's Website—affected by the unauthorized disclosures that have taken place.

**COUNT I**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. §§ 2511(1), *et seq.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Nationwide Class)***

132.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-131 as if fully set forth herein.

133.    The ECPA protects both sending and receipt of communications.

134.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

135.    The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

136.    <u>Electronic Communications</u>. The transmission of Sensitive Health Information between Plaintiff and Class Members and Defendant, through the Website, are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

137.    <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

138.    <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

139.    <u>Electronic, Mechanical, or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] . . . electronic

28

CLASS ACTION COMPLAINT

communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

      a. Plaintiff's and Class Members' browsers;

      b. Plaintiff's and Class Members' computing devices;

      c. Defendant's web-servers; and

      d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of user and Website user communications.

140. By utilizing and embedding the Pixels and Tracking Tools on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

141. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels and Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Sensitive Health Information to third parties such as Google.

142. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including information related to the addiction treatments they sought and insurance coverage for such treatments.

143. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

144. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

145. <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of

29

CLASS ACTION COMPLAINT

privacy, among others.

146.    The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

147.    Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exception.

148.    Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

> a.   Invasion of privacy;
>
> b.   Breach of confidence;
>
> c.   Breach of fiduciary duty; and
>
> d.   Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3).

149.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google without user authorization.

150.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Sensitive Health Information with Google and other third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

151.    As such, Defendant cannot viably claim any exception to ECPA liability.

30

CLASS ACTION COMPLAINT

152.    Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.  Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b.  Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

c.  Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

d.  Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e.  The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

153.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Health Information for financial gain.

154.    Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

155.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

156.    Any purported consent that Defendant may claim it received from Plaintiff and Class Members was not valid.

157.    In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

158.    As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief,

31

compensatory and punitive damages, and attorneys' fees and costs.

## COUNT II
### COMMON LAW INVASION OF PRIVACY
*(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)*

159.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-158158 as if fully set forth herein.

160.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

161.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

162.    Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

163.    Defendant's interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

164.    Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

165.    Defendant's disclosure and publicization of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

166.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

32

CLASS ACTION COMPLAINT

167.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

168.    Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

169.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

170.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT III**
**BREACH OF CONFIDENCE**
***(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)***

171.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-170 as if fully set forth herein.

172.    Medical providers have a duty to their patients to keep non-public medical information completely confidential.

173.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

174.    Contrary to its duties as a medical provider and its promises of confidentiality, Defendant deployed the Tracking Tools to disclose and transmit Plaintiff's and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendant to third parties.

175.    The third-party recipients included, but were not limited to, Google and other online marketers.

176.    Defendant's disclosures of Plaintiff's and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were privileged.

33
CLASS ACTION COMPLAINT

177. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

178. As a direct and proximate cause of Defendant's unauthorized disclosures of personally identifiable, non-public medical information and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b. Defendant eroded the essential confidential nature of the provider-patient relationship;

    c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

    d. Defendant's actions diminished the value of Plaintiff's and Class Members' Sensitive Health Information; and

    e. Defendant's actions violated the property right Plaintiff and Class Members have in their Sensitive Health Information.

179. Plaintiff and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiff is also entitled to punitive damages.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
***(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)***

180. Plaintiff repeats and realleges the allegations contained in paragraphs 1-179 as if fully set forth herein.

181. In light of the special relationship between Defendant on one hand and Plaintiff and Class Members on the other, whereby Defendant became guardian of Plaintiff's and Class Members' Sensitive Health Information, Defendant has a fiduciary duty to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Sensitive Health Information; (2) to timely and adequately notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

34

CLASS ACTION COMPLAINT

182.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with its patients, prospective patients and former patients, and in particular, to keep their Sensitive Health Information secure.

183.    Defendant breached its fiduciary duties to Plaintiff and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, including Google, and separately, by failing to notify Plaintiff and Class Members of this fact.

184.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT V
## NEGLIGENCE
### *(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)*

185.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-184 as if fully set forth herein.

186.    Through their use of the Website, Plaintiff and Class Members provided Defendant with their Sensitive Health Information, believing such information would be kept confidential.

187.    By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

188.    Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

189.    Defendant further negligently omitted to inform Plaintiff and the Class that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

190.    Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

35

CLASS ACTION COMPLAINT

191. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

192. Though all medical information is sensitive, disclosing information related to addiction can have personal and economic repercussions above and beyond those associated with other medical conditions.

193. Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

194. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

<u>**COUNT VI**</u>
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)*

195. Plaintiff repeats and realleges the allegations contained in paragraphs 1-194 as if fully set forth herein.

196. When Plaintiff and Class Members provided their Sensitive Health Information to Defendant in exchange for information and services related to addiction treatment, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Health Information without consent.

197. Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

198. Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Health Information without consent.

36

CLASS ACTION COMPLAINT

199. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Health Information to third parties like Google.

200. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

201. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

202. Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

### COUNT VII
### UNJUST ENRICHMENT
*(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the California Subclass)*

203. Plaintiff repeats and realleges the allegations contained in paragraphs 1-202202 as if fully set forth herein.

204. Plaintiff pleads this claim in the alternative to her breach of implied contract claim.

205. Plaintiff and Class Members conferred a monetary benefit on Defendant in exchange for information and services related to addiction treatment. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

206. Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

207. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

208. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its user's and Sensitive Health Information.

CLASS ACTION COMPLAINT

209.    Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

210.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

211.    Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

212.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

213.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**COUNT VIII**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**CAL. PENAL CODE § 631**
***(On Behalf of Plaintiff and the California Subclass)***

214.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-213 as if fully set forth herein.

215.    The California Legislature enacted CIPA finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

216.    Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any

38

CLASS ACTION COMPLAINT

unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

217. AAC is a person for purposes of § 631.

218. The Tracking Tools, Plaintiff's and Subclass Members' computers and devices are each a "machine, instrument, contrivance, or . . . other manner" under § 631.

219. At all relevant times, Defendant aided, employed, agreed with, and conspired with third parties, including Google, to track and intercept Plaintiff's and Subclass Members' internet communications while accessing the Website. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiff's and Subclass Members.

220. Defendant intentionally inserted an electronic listening device onto Plaintiff's and Subclass Members' web browsers that, without their knowledge and consent, tracked, intercepted, and transmitted the substance of their confidential communications with Defendant to Google—each of whom constitute a "person" within the meaning of the statute.

221. Defendant willingly facilitated third parties' interception and collection of Plaintiff's and Class Members' private health information by embedding the Tracking Tools on the Website. Defendant has full control over the Tracking Tools on the Website, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

222. Defendant failed to disclose its use of the Tracking Tools to track and simultaneously transmit Plaintiff's and Class Members' communications with Defendant to undisclosed third parties.

CLASS ACTION COMPLAINT

223.    The Tracking Tools are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication, and so they are used in real-time to begin identifying and tracking the actions of individual consumers. As a result, the communications were intercepted and used in transit before reaching their final resting point.

224.    Thus, Defendant violated CIPA § 631 by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the Website. Importantly, Google would not have intercepted or received the contents of these communications but for Defendant's actions and incorporation of the Tracking Tools onto the Website.

225.    By disclosing Plaintiff's and Class Members' private information, including Sensitive Health Information, Defendant violated Plaintiff's and Subclass Members' statutorily protected right to privacy.

226.    This conduct occurred in California, where Plaintiff and Subclass Members reside and were harmed, and where these communications were received by Google.

227.    Plaintiff and the Class Members seek statutory damages in accordance with Cal. Pen. Code. § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Subclass in an amount to be proven at trial, as well as injunctive or other equitable relief that may be proper.

228.    Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' confidential and private data has been collected, viewed, accessed, used, and stored by Defendant, and has not been destroyed. Due to the continuing threat of such injury, Plaintiff and Class Members have no adequate remedy at law, and therefore, Plaintiff and Class Members are entitled to equitable relief, including injunctive relief.

**COUNT IX**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**CAL. PENAL CODE §§ 638.50 & 638.51**
*(On Behalf of Plaintiff and the California Subclass)*

229.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-228 as if fully set forth herein.

40

CLASS ACTION COMPLAINT

230. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

231. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

232. CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

233. AAC is a person under CIPA § 638.51.

234. Defendant implemented and installed the Tracking Tools—which are pen registers and/or trap and trace devices—on Plaintiff's and Subclass Members' devices and browsers.

235. These Tracking Tools captured "routing, addressing, or signaling information" because they intercept unique user and device identifiers, including IP address, and cookies used for purposes of identification.

236. Defendant was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiff's and Subclass Members' routing, addressing, or signaling information.

237. Plaintiff and Subclass Members did not consent to Defendant's installation of a pen register or trap and trace device on their devices and browsers.

238. Plaintiff and Subclass Members have been harmed as a result of Defendant's conduct. Defendant did not have authorization to use pen registers and/or trap and trace devices to surveille and identify Plaintiff's and Subclass Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

239. Plaintiff and Subclass Members face an imminent threat of continued injury, as this data continues to be stored and used by third parties, such that Plaintiff and Subclass Members have no adequate remedy at law.

CLASS ACTION COMPLAINT

240.    Plaintiff and Subclass Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**COUNT X**
**INVASION OF PRIVACY UNDER ARTICLE I, SECTION 1**
**OF THE CALIFORNIA CONSTITUTION**
*(On Behalf of Plaintiff and the California Subclass)*

241.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-240 as if fully set forth herein.

242.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

243.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

244.    The right to privacy in California's Constitution creates a right of action against private and government entities.

245.    Plaintiff and the California Subclass Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution.

246.    The identifiable and private information Defendant disclosed to third parties without Plaintiff's and California Subclass Members' consent was used, among other things for targeted advertising purposes. The manner in which Defendant disclosed this information defeated established privacy-mechanisms, social norms, reasonable expectations, and various laws, including HIPAA.

CLASS ACTION COMPLAINT

247.    Ther conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there are third parties intercepting their private health information, let alone using it for profit.

248.    Defendant's conduct violated the privacy of hundreds of thousands (if not millions) of Subclass Members, including Plaintiff. Defendant did not have consent to disclose this information.

249.    Plaintiff and Subclass Members have been damaged as a direct and proximate result of Defendant's privacy invasions and are entitled to just compensation, including monetary damages. Plaintiff and Subclass Members seek all appropriate relief for that injury, including but not limited to damages and all other relief that may be just or proper.

250.    Plaintiff and Subclass Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, prays for judgment against Defendant as follows:

A.    an Order certifying the Class, and appointing the Plaintiff and her Counsel to represent the Class;

B.    equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C.    injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.    an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.    an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    prejudgment interest on all amounts awarded; and

43

CLASS ACTION COMPLAINT

G.      all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and other members of the proposed Class, hereby demands a jury trial on all issues so triable.

DATED this 10th day of July 2026.

Respectfully submitted,

By: */s/  Mona Amini*
Mona Amini, Esq.
Nevada Bar No. 15381
**KAZEROUNI LAW GROUP, APC**
6940 S. Cimarron Road, Suite 210
Las Vegas, NV 89113
Tel: 800-400-6808
E: mona@kazlg.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

*Attorneys for Plaintiff M.C.*

**pro hac vice admission anticipated*

44

CLASS ACTION COMPLAINT